2002-NMCA-069

50 P.3d 175

**In the Matter of the ESTATE OF Georgia A. DUNCAN, Deceased, Plaintiff–Appellee.**

**No. 21,326.**

Court of Appeals of New Mexico.

March 6, 2002.

Certiorari Granted, No. 27,516, June 14, 2002.

C. Gene Samberson, Lewis C. Cox, III, Heidel, Samberson, Newell & Cox, Lovington, NM, for Appellants Dean & Brenda Kinsolving.

Alvin Joe Parker, Parker Law Office, P.C., Clovis, NM, for Appellee Wraldo Presley Duncan.

Richard F. Rowley, II, Rowley Law Firm, P.C., Clovis, NM, for Appellee Estate of Georgia A. Duncan.

Glen Houston, William & Houston, LTD, Hobbs, NM, for Appellee Jimmy Anderson Duncan.

Marion J. Craig, III, Marion J. Craig, III, P.C., Roswell, NM, for Appellee heirs of the Estate of Estelle Lee Duncan.

Joe Ann Duncan, Aztec, NM, Pro Se Appellee.

Robert Wraldo Duncan, Jr., Tatum, NM, Pro Se Appellee.

*OPINION*

ROBINSON, Judge.

{1} Appellants Dean and Brenda Kinsolving (hereinafter "Lessees") appeal from a district court order entered after the personal representative of the Estate of Georgia A. Duncan (hereinafter "Decedent") sought declaratory relief concerning the legal status of three separate properties subject to a lease agreement made between Lessees and Decedent (hereinafter "the Lease"). These properties consisted of a 5360-acre ranch, an adjacent parcel consisting of 320 acres, and a house and lot located in Ruidoso.

{2} On appeal, Lessees claim that the underlying informal probate action was never converted into a formal probate proceeding, and as a consequence, the district court lacked subject matter jurisdiction to enter an order affecting the lease in question. Lessees also claim that their lease did not automatically terminate at Decedent's death. Alternatively, they argue that the Decedent's heirs expressly or through their behavior ratified the continuation of the lease. Lessees also claim that the Ruidoso property was held in full fee interest by Decedent and therefore was not subject to any remainder interests that could affect the terms of the lease. Finally, Lessees claim that it is undisputed that the 320-acre parcel was held in full fee interest by Decedent and was not encumbered in any manner that would limit the terms of the lease. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

{3} The dispute in this case can be traced back to 1968, when Decedent's husband, Robert Wraldo Duncan, died intestate. At the time of his death, Robert Wraldo Duncan and Decedent had six living children, two of whom were minors and were thereafter represented by a guardian ad litem in efforts to resolve matters relating to their father's estate.

{4} On May 20, 1969, Decedent and her children entered into a settlement agreement addressing the distribution of Robert Wraldo Duncan's assets. Under a critical portion of this agreement, the parties agreed to:

> bargain, sell and convey, transfer, assign and set over and quitclaim any and all *real property* belonging to the said Robert Wraldo Duncan, deceased, and his interest only, at the time of his death, said interest being separate, community or mixed as follows:
>
>> To Georgia Anderson Duncan goes a life estate with the remainder over in equal shares [to the children].

{5} This 1969 agreement only addressed property belonging to Robert Wraldo Duncan "at the time of his death, and not any of the properties belonging to Georgia Anderson Duncan whether they be personal, real, community, separate or mixed or wheresoever situated."

{6} Prior to his death, Robert Wraldo Duncan and Decedent owned as part of their undivided community property a family ranch (hereinafter "Tatum Ranch") consisting of 5360 acres. The Tatum Ranch also included an additional 320 acres that was owned by Decedent as her sole and separate property. The Tatum Ranch therefore consisted of 5680 acres. The couple also owned, as joint tenants, a house and lot in Ruidoso. Shortly after Decedent and her children entered into the 1969 settlement agreement, an inventory was conducted of Robert Wraldo Duncan's community property at the time of his death. Neither the 320-acre parcel of the Tatum Ranch or the Ruidoso property appears as part of this inventory.

{7} The ranching operation began experiencing financial difficulties within a few years after the death of Robert Wraldo Duncan. The holder of the mortgage on the Tatum Ranch threatened foreclosure. In response, Decedent secured a loan in 1978 from the Farmers Home Administration (hereinafter "FmHA"). This loan paid off the previous mortgage as well as debts individually owed by the children. It appears that Decedent made payments on the FmHA loan from 1978 until her death in 1997.

{8} Between approximately 1985 and 1995, Decedent and Lessees entered into an oral, year-to-year lease of the Tatum Ranch. The agreement was formalized in 1995, and it is this lease that is at the center of the present dispute. The lease became effective on January 1, 1996, and was to have a term of ten years. The lease sets forth a legal description of the Tatum Ranch, to be used for "ordinary cattle grazing purposes, and such other purposes as may be contained herein." In consideration for the use of the Tatum Ranch, Lessees agreed to make total cash payments of $248,000, to be paid in $12,400 semi-annual installments. Near the end of the lease, and without any separately referenced consideration, the parties agreed to two additional provisions: Lessees would have exclusive use of the Ruidoso property, subject only to use by Decedent as she so desired, and Lessees would have an option to purchase all of the real property within six months of the expiration of the lease.

{9} Decedent died on March 29, 1997, only fifteen months into the ten-year lease. Decedent was survived by four of her six children: Joe Ann Duncan, Jimmy Anderson Duncan, Wraldo Presley Duncan, and Robert Wraldo Duncan Jr. (hereinafter "Robert Jr."). One of her children, Tommy Lynn Duncan, predeceased her without heirs and, therefore, any interest he had under the 1969 settlement agreement reverted to Decedent. Another child who predeceased Decedent, Estelle Lee Duncan, was survived by two children: Troy Lee Duncan and Sherry Glen.

{10} On April 7, 1997, Robert Jr. filed an application for informal probate of Decedent's will, requesting that he be appointed as personal representative of the estate. Although Joe Ann Duncan had been named in the original will as alternate personal representative to her predeceased sister Estelle Lee Duncan, Robert, Jr. had been named as the personal representative in the codicil executed by Decedent on January 26, 1997, approximately two months before her death. The application was granted.

{11} On May 5, and May 9, 1997, Joe Ann Duncan, through counsel, filed a request for hearing and a "Petition to Set Aside Informal Probate of Will and for Formal Appointment of Personal Representative." The petition requested that the codicil be deemed invalid and that Joe Ann Duncan be appointed personal representative of the estate. Wraldo Presley Duncan also filed a petition challenging the codicil and calling for the removal of Robert Jr. as the personal representative. In response, the district court appointed Ribble Holloman to serve as temporary administrator of the estate, to become permanent unless Joe Ann Duncan sought separate appointment within sixty days. A hearing on Joe Ann's petition was initially scheduled for November 6, 1997. The matter was delayed after the successive recusals of two judges. Finally, on March 9, 1998, the district court filed its Order Denying Joe Ann Duncan's Petition to Set Aside Informal Probate and Appointment of Ribble Holloman as Personal Representative. Letters testamentary were issued to Holloman without restrictions.

{12} The current dispute was triggered on June 29, 1998, when Holloman, acting in his capacity as personal representative, filed a motion for declaratory relief. Hollomon asked for guidance on two issues: (1) whether the FmHA loan as related to any individual indebtedness of the children should affect the distribution of assets; and (2) whether the lease and its purchase option was enforceable. After numerous pleadings filed by Lessees and the Duncan children and grandchildren, the district court issued its ruling. The district court concluded that the 1969 settlement agreement created a life estate for any interest previously held by Robert Wraldo Duncan, including the entirety of the Tatum Ranch and the Ruidoso property. In effect, the district court concluded that all of

the provisions of the lease terminated at the death of Decedent.

## DISCUSSION

### I. Subject Matter Jurisdiction

{13} Lessees claim that the district court lacked subject matter jurisdiction to consider the lease and the properties at issue in this case because the informal probate proceedings were never converted into formal probate. The resolution of this issue requires us to interpret New Mexico's constitutional and statutory language governing probate proceedings. Accordingly, we engage in a de novo review. *Morgan Keegan Mortgage Co. v. Candelaria*, 1998–NMCA–008, ¶ 5, 124 N.M. 405, 951 P.2d 1066.

{14} To understand Lessees' jurisdictional argument, it should be recognized that New Mexico probate law is unique as it relates to jurisdiction because the New Mexico Constitution specifically limits the powers of probate courts, preventing them from ruling on matters affecting title or possession of real property. N.M. Const. art. VI, § 23. Under the Uniform Probate Code (UPC), NMSA 1978, § 45-1-101 through 45-8-9 (1998), courts overseeing probate matters do not have this restriction. As a result, when the New Mexico legislature adopted the UPC in 1975, *see* 1975 N.M. Laws, ch. 257, 110–1348, it was necessary to modify the UPC to satisfy any potential conflict with New Mexico Constitution, article VI, section 23. The legislature addressed this in the context of the UPC's distinction between informal and formal probate proceedings. As this Court has recently observed, the UPC allows for the administration of an estate to involve both informal and formal proceedings, in order to permit flexibility and efficiency. *In re Estates of Brown*, 2000–NMCA–030, ¶ 12, 128 N.M. 825, 999 P.2d 1057.

{15} The distinctions between informal and formal proceedings include the degree of notice and judicial oversight required. *Id.* For purposes of jurisdiction, however, the legislature addressed Article VI, Section 23 by vesting district courts with exclusive jurisdiction over formal probate proceedings, and required any issues involving title to real property be addressed in such proceedings. NMSA 1978, § 45-1-302 (1978); *In re Estate*

*of Harrington*, 2000–NMCA–058, ¶ 23, 129 N.M. 266, 5 P.3d 1070. As such, the district court here was not restricted in terms of jurisdiction, because our case law interpreting New Mexico's version of the UPC makes it clear that the district court can shift back and forth between informal and formal probate proceedings. *Brown*, 2000–NMCA–030, ¶ 12, 128 N.M. 825, 999 P.2d 1057; *Harrington*, 2000–NMCA–058, ¶ 19, 129 N.M. 266, 5 P.3d 1070. The more accurate question is whether the statutory provisions governing formal probate proceedings were triggered.

{16} Lessees argue that this matter was never converted into formal probate because the district court specifically denied Joe Ann Duncan's motion to set aside the informal probate, and no other event occurred that would have satisfied the statutory requirements. As stated above, Joe Ann Duncan had filed a petition to set aside informal probate, challenging the codicil of the will designating the appointment of Robert Jr. as personal representative. Although the district court denied her petition, it nevertheless appointed Holloman (who had previously been designated as temporary administrator of the estate) as the personal representative. In reviewing the order in question, the judge concluded that language referring to Holloman being "formally" appointed constituted a conversion to formal probate proceedings. Lessees challenge the rationale of this ruling.

{17} We agree with Lessees that the apparent rationale of the court, standing alone, would not survive appellate review. Specifically, there is no provision in the UPC that triggers formal proceedings based on the mere mention of the word "formally." However, we do not believe that it is necessary to consider the March 9, 1998, order as a basis for converting the proceedings from informal to formal. Instead, we conclude that formal proceedings were activated in three separate ways under the facts of this case.

{18} Initially, we can simply say that, by challenging the 1997 codicil, Joe Ann Duncan challenged the validity of the will, thereby transforming this into a formal probate proceeding under NMSA 1978, § 45-3-401(A) (1975) ("A formal testacy proceeding is litiga-

tion to determine whether a decedent left a valid will."). While it is true that Joe Ann Duncan only challenged the 1997 codicil addressing the appointment of a personal representative, the statute does not make any exception for limited challenges to wills, and we do not read in such an exception for purposes of conversion to formal probate. *Cf. High Ridge Hinkle v. Albuquerque,* 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (holding that courts will not read language into statute, especially where statute makes sense as written). In addition, we do not view this as a challenge under NMSA 1978, § 45–3–611(B) (1975), which allows a personal representative to be removed separate from any challenge to the validity of a will. Here, because Joe Ann challenged the will (codicil) itself, as opposed to any unrelated behavior of Robert Jr., we do not view this as a Section 45–3–611(B) removal, but instead as a challenge to the validity of the will as contemplated by Section 45–3–401(A).

{19} The second way that this became a formal probate proceeding is based on Section 45–3–401(A)(2), which states that formal probate proceedings are commenced by the filing of "a petition to set aside an informal probate of a will or to prevent informal probate of a will which is the subject of a pending application." As applied here, Joe Ann Duncan converted these proceedings into formal probate when she filed her petition to set aside informal probate. While it is true that the district court subsequently issued an order denying her petition, we agree with Appellees argument that Section 45–3–401(A)(2) by its plain terms commences formal probate on the filing of this petition. While the district court order states that it denied Joe Ann's petition, her petition had requested the removal of Robert Jr. and her substitution as the personal representative. The district court granted her partial relief by temporarily, and then permanently, substituting Holloman as the personal representative.

{20} The third ground is also based on Section 45–3–401(A)(2), and dispels any uncertainty that formal probate proceedings may not have been triggered up to this point. As previously noted, the specific issues in this appeal arose from the filing of the motion for declaratory relief. The motion requested the court to resolve the uncertainties relating to the lease. As such, it requested the court to exercise its formal probate authority under Section 45–1–302(B). It follows that a request for a court to exercise its general civil jurisdiction in formal probate is a request to "prevent informal probate" as contemplated by Section 45–3–401(A)(2). We came to a similar conclusion in *Brown,* where the appellant had argued that an informal probate procedure needed to be followed relating to distribution of estate assets. *Brown,* 2000–NMCA–030, ¶ 15, 128 N.M. 825, 999 P.2d 1057. We determined that the district court could have deemed these provisions inapplicable, since related matters had been converted to formal probate. *Id.* Similarly, we give practical effect to the filings in this case.

{21} All three of the above-noted grounds for determining that this probate went from informal to formal are consistent with promoting judicial efficiency and the timely resolution of estate matters. Accordingly, we affirm the district court's authority to address issues relating to the lease.

## II. Lease

{22} It is undisputed that the 1969 settlement agreement created a life estate in Decedent of Robert Wraldo Duncan's community share of that portion (5360 acres) of the Tatum Ranch that was not held as separate property by Decedent (the remaining 320 acres). Of the three properties at issue in this appeal, the 5360–acre portion of the Tatum Ranch is by far the most significant, and is also the easiest to address in terms of its legal status after the death of Decedent. Therefore, we initially focus on this property.

{23} Lessees claim that the 5360 acres subject to the life estate did not revert to the heirs upon the death of Decedent. Lessees present two lines of reasoning to support this theory. The first is confusing because it sets forth case law recognizing the rule that a lease generally continues past the death of the lessor, but then acknowledges that an exception exists where the lessor had a life estate in the property. New Mexico

follows the majority rule that a lease given by the holder of a life estate terminates at the death of the lessor. *Nevarez v. State Armory Bd.*, 84 N.M. 262, 266–67, 502 P.2d 287, 291–92 (1972); *see generally* 51 Am. Jur.2d, *Life Tenants & Remaindermen* § 109 (2000). Although Lessees appear to argue that Decedent's 7/12 interest (increasing to 9/12 interest if the non-objecting heirs' ratification is added) makes the life estate exception inapplicable, they fail to cite any case law in support of this contention. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (arguments unsupported by authority not reviewed). As a result, the attempt to distinguish this from the general rule governing life estates is without merit.

{24} Lessees' alternative argument is that the objecting heirs ratified the lease through acquiescence. As Lessees note in their brief, "[r]atification is adoption or confirmation by a principal of an unauthorized act performed on its behalf by an agent." *Ulibarri Landscaping Material, Inc. v. Colony Materials, Inc.*, 97 N.M. 266, 270, 639 P.2d 75, 79 (Ct.App.1981). Ratification can either be express or implied through conduct. *Grandi v. Le Sage*, 74 N.M. 799, 810–11, 399 P.2d 285, 293–94 (1965). Lessees' specific argument is that the objecting heirs failed to instruct the personal representative to refuse payments made under the lease and, additionally, that they benefitted from these payments. However, Lessees' argument fundamentally mis-characterizes the nature of these proceedings. The personal representative was not acting as an agent of the heirs. To the contrary, the role of the personal representative is to settle and efficiently distribute the estate of a probated will in accordance with the terms of the UPC. NMSA 1978, § 45–3–703(A) (1975). Although the personal representative may surrender property to presumptive heirs, this is left to the discretion of the personal representative based on the needs to administer the estate. NMSA 1978, § 45–3–709 (1975). Here, the personal representative chose to maintain the status quo while pursing a ruling from the district court on the admittedly complicated estate issues relating to the lease.

{25} In short, the personal representative's decision to litigate these issues did not amount to ratification; nor did the heirs' failure to make fruitless attempts at immediate possession amount to ratification. While it is true that the estate may have benefitted from the lease payments made during the course of this adjudication, this should not be viewed as ratification of the entire lease term because the litigation itself was designed to sort out the respective interests.

### III. Legal Status Of Properties Under the Lease

{26} As discussed above, the vast majority (5360 acres) of the properties at issue in this case were subject to a life estate and therefore vested with the remaindermen upon Decedent's death. This leaves us with the Ruidoso property and the 320–acre parcel of the Tatum Ranch that were held as separate property by Decedent. Although the district court found that the Ruidoso joint tenancy property was implicitly included in the 1969 settlement agreement giving Decedent a life estate in Robert Wraldo Duncan's community property, the evidence is insufficient to extinguish Decedent's right of survivorship in this property. *Cf. In re Estate of Heeter*, 113 N.M. 691, 694, 831 P.2d 990, 993 (Ct.App.1992) (holding the law presumes right of survivorship). The Ruidoso property automatically reverted to Decedent in full when her husband died in 1968. As a result, we would need more evidence that Decedent intended to include this as part of the 1969 agreement. The district court's reasoning is also contradicted by the omission of this property from the inventory of Robert Wraldo Duncan's estate that was made pursuant to the 1969 agreement. Likewise, the district court's treatment of the 320–acre parcel is somewhat puzzling, since it is undisputed that this was never part of the 1969 agreement.

{27} Notwithstanding these irregularities, we agree with the court's alternative line of reasoning to support the view that the lease

to all properties terminated at the time of Decedent's death. Specifically, once it is determined that the lease is no longer valid with respect to the 5360–acre portion of the Tatum Ranch, any additional performance under the lease is made impracticable and the underlying purpose (cattle grazing, with a recreational property thrown in for good measure) is frustrated to the point where the lease is voided by operation of law. As set out in Restatement (Second) of Contracts, § 261 (1979), the doctrine of impracticability applies where "a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." The doctrine of impracticability is also referred to in some texts as the doctrine of impossibility, but the underlying concept is the same. *See, e.g.,* 6 Arthur L. Corbin, *Corbin on Contracts,* § 1321 at 324–25 (1951).

{28} Here, any performance under the contract is made impracticable for two reasons. First, the grazing would be reduced from 5680 acres to 320 acres. Second, the parties did not include any separate method for valuation of the Ruidoso property or, for that matter, the purchase option. Even if the 320–acre parcel could be given a per-acre grazing valuation, this small income to the estate would not justify continuing these other provisions, which were presumably included in the original lease to "sweeten the pot" for Lessees.

{29} A related means of voiding the lease is to apply the doctrine of frustration. *Cf.* 6 Corbin, § 1322 at 325–333 (1951) (comparing doctrines of impossibility and frustration). As set forth in Restatement (Second) of Contracts, § 265:

a party's principal purpose is substantially frustrated without his fault by the occurrence of an event, the non occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or circumstances indicate the contrary.

{30} As noted in the accompanying commentary, "[t]he object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." Here, it makes little sense to continue a grazing lease reduced from 5680 to 320 acres, especially where the Ruidoso property and the purchase option are not separately addressed in terms of any consideration. Although the parties had contemplated a remedy for the extinguishment of the lease as it related to any life estate, this only addressed refunds for overpayment. In the absence of any provision that provides for contingencies under these circumstances, it "makes little sense" to carry forward the lease. Accordingly, the district court properly applied the above-noted doctrines in concluding that the Ruidoso property and the 320–acre property were incapable of division.

## CONCLUSION

{31} For the reasons discussed above, we conclude (1) formal probate proceedings were initiated in any of a number of ways, and certainly by the time the declaratory judgment complaint was filed, thereby authorizing the district court to rule on the matters presented; (2) the lease terminated as to the 5360–acre property upon Decedent's death, and was not thereafter revived through ratification; and (3) impracticability of performance and frustration of purpose justify voiding the remaining provisions of the lease. We affirm.

{32} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and CELIA FOY CASTILLO, Judges.