2007-NMCA-121

168 P.3d 147

**In the Matter of the Estate of George Gushwa, Deceased.**

**Zane GUSHWA, Petitioner–Appellant,**

v.

**Wanda HUNT, Respondent–Appellee.**

**No. 26,887.**

Court of Appeals of New Mexico.

June 14, 2007.

Certiorari Granted, No. 30,592, Sept. 17, 2007.

Doerr & Knudson, P.A., Randy Knudson, Portales, NM, for Appellant.

Garrett Law Firm, P.A., Michael T. Garrett, Clovis, NM, for Appellee.

## OPINION

PICKARD, Judge.

{1} Petitioner appeals from the district court's award of summary judgment in favor of Respondent in a probate proceeding involving the death of Petitioner's husband. We refer to Petitioner as "Wife" and to Respondent, who is Decedent's niece, as "Niece." In granting summary judgment, the district court found that no issues of material fact existed and that, as a matter of law, Decedent did not revoke his last will and testament. On appeal, Wife argues that issues of material fact do exist and that the district court erred in granting summary judgment in favor of Niece. We hold that Decedent's "Revocation of Missing Will(s)" document does not satisfy the requirements of NMSA 1978, § 45–2–507(A)(1) (1993), and therefore did not validly revoke his prior will. We also hold that the performance of a revocatory act on a photocopy of a will does not affect a valid revocation of the original will. See § 45–2–507(A)(2). Accordingly, we affirm the district court's grant of summary judgment in favor of Niece.

## BACKGROUND

{2} The pertinent facts, which we view in the light most favorable to the party appealing the district court's grant of summary judgment, are as follows. See Stieber v. Journal Publ'g Co., 120 N.M. 270, 271–72, 901 P.2d 201, 202–03 (Ct.App.1995). Dece-

dent died on February 12, 2005, at the age of ninety. Wife subsequently filed an application for informal appointment of a personal representative, requesting that she be appointed as personal representative. In her application, Wife asserted that Decedent had died intestate and that he had left no devisees. Wife further asserted that she was unaware of "any unrevoked testamentary instrument relating to property" within the State of New Mexico. Niece subsequently filed an objection to Wife's application to be appointed personal representative. In her objection, Niece claimed that Decedent did in fact have a last will and testament and that Wife should not be appointed personal representative as she is not a devisee under the will and because Wife is in a position of conflict of interest due to her transfer of some of Decedent's assets after his death.

{3} Decedent had his will drafted while Wife was in the hospital during the spring of 2000. During Wife's hospitalization, Decedent contacted another niece and her husband, Betty and Ted Dale, and asked them to help him get a will prepared. The will provided that Decedent's separate property, which included his ranch and oil, gas, and mineral interests, would be held in trust for the benefit of Wife during her lifetime. Upon Wife's death, the will provided that the trust assets would be distributed to seven of his nieces and nephews. The original will was given to Betty and Ted Dale, who were not beneficiaries under the will, for safekeeping.

{4} When Wife learned of Decedent's will, she requested a copy from Ted Dale (Dale). Dale provided Wife with a copy of only three pages of the will. Wife asserts that Decedent eventually had second thoughts about the will because he believed he was pressured or tricked into executing it. According to Wife, Decedent then contacted Dale twice by phone and requested that Dale send him the original will so it could be destroyed. Wife asserts that Dale refused to return the will.

{5} After Dale refused to return the will, Decedent contacted a lawyer for assistance in revoking the will. The lawyer prepared a document titled "Revocation of Missing Will(s)," in which Decedent stated that he wished to revoke his prior wills and that he had written the word "revoked" on the copy of the three pages of the will, which were supposedly attached to the signed document. Decedent further stated that it was his intent that Betty and Ted Dale were not to inherit anything from his estate. The document was signed by Decedent and two witnesses and was also notarized. The document was eventually recorded with the Roosevelt County Clerk's Office, but the three photocopied pages of the will on which Decedent had written "revoked" were not attached.

{6} According to Wife, the lawyer hired by Decedent to revoke the will was eventually able to obtain a photocopy of the will from the lawyer who had originally prepared it. Decedent then wrote the word "revoked" and his initials across each page of the photocopy. This photocopy was also signed by Decedent and notarized. The photocopy of the original will was subsequently recorded with the Roosevelt County Clerk's Office along with the "Revocation of Missing Will(s)" document.

{7} Before the district court, Niece disputed Wife's claim that Decedent contacted Dale to obtain his original will and maintained that Decedent never told Dale that he wished to revoke his will. Niece argued to the district court that Decedent's method of revocation in the instant case was ineffective as a matter of law. As such, Niece claimed that Decedent's last will and testament had not been revoked and therefore should be admitted to probate. Wife disagreed, arguing that Decedent had been prevented from obtaining his original will and that his attempt to revoke his will was effective.

{8} Agreeing with Niece's assertions, the district court granted partial summary judgment in favor of Niece and denied Wife's countermotion for summary judgment. In granting Niece's motion, the district court concluded that the "Revocation of Missing Will(s)" document was not testamentary in character and therefore could not serve to revoke Decedent's will. Additionally, the court concluded that writing "revoked" on the pages of a photocopy of the will was ineffective, as the revocatory act must be

done on the original will itself or on a "duplicate" original, which is not the same as a photocopy. Wife appeals.

## STANDARD OF REVIEW

{9} A district court's grant of summary judgment is reviewed de novo. *Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. A party moving "for summary judgment need only make a prima facie showing that there is no genuine issue of material fact, and that on the undisputed material facts, judgment is appropriate as a matter of law." *Ciup v. Chevron U.S.A., Inc.*, 1996–NMSC–062, ¶ 7, 122 N.M. 537, 928 P.2d 263; *see also Roth v. Thompson*, 113 N.M. 331, 335, 825 P.2d 1241, 1245 (1992) ("If the facts are not in dispute, and only their legal effects remain to be determined, summary judgment is proper."). At that point, the burden shifts to the nonmoving party to demonstrate "at least a reasonable doubt, rather than a slight doubt, as to the existence of a genuine issue of fact." *Ciup*, 1996–NMSC–062, ¶ 7; *see also Oschwald v. Christie*, 95 N.M. 251, 253, 620 P.2d 1276, 1278 (1980) ("Summary judgment may be proper even though some disputed issues remain, if there are sufficient undisputed facts to support a judgment and the disputed facts relate to immaterial issues."). This Court "view[s] the facts in a light most favorable to the party opposing the motion and draw[s] all reasonable inferences in support of a trial on the merits." *Handmaker v. Henney*, 1999–NMSC–043, ¶ 18, 128 N.M. 328, 992 P.2d 879.

## DISCUSSION

{10} On appeal, Wife argues that the district court erred in granting summary judgment in favor of Niece because there are material facts in dispute and because the district court incorrectly concluded as a matter of law that Decedent did not revoke his will. Specifically, Wife contends that (1) the "Revocation of Missing Will(s)" document contained testamentary language and was executed with the necessary formalities, and it was therefore effective in revoking Decedent's will; and (2) Decedent's act of writing "revoked" across the pages of a photocopy of his will was sufficient to revoke the original will. Wife also contends that whether Decedent actually contacted Dale and attempted to obtain the original will is an issue of disputed material fact that precludes summary judgment. In addressing Wife's arguments, we will first examine the law regarding revocation of wills. Next, we will determine whether either of Decedent's two attempts to revoke his will was sufficient to revoke the will under New Mexico probate law. Additionally, we will decide whether the assertion that Decedent attempted to obtain the original will is in dispute and, if so, whether it is a material fact precluding summary judgment. We have jurisdiction to consider Wife's appeal from the district court's grant of partial summary judgment pursuant to the rule described in *In re Estate of Newalla*, 114 N.M. 290, 294, 837 P.2d 1373, 1377 (Ct.App.1992) ("[T]he Probate Code teaches that as a practical matter each petition in a probate file should ordinarily be considered as initiating an independent proceeding, so that an order disposing of the matters raised in the petition should be considered a final, appealable order.").

{11} With some modifications, New Mexico adopted the Uniform Probate Code (UPC) in 1975. *In re Estate of Duncan*, 2002–NMCA–069, ¶ 14, 132 N.M. 426, 50 P.3d 175, *rev'd on other grounds by Estate of Duncan v. Kinsolving*, 2003–NMSC–013, 133 N.M. 821, 70 P.3d 1260; *In re Estate of Jewell*, 2001–NMCA–008, ¶ 8, 130 N.M. 93, 18 P.3d 334; *see generally* NMSA 1978, §§ 45–1–101 to –9A–13 (1975, as amended through 2005). The UPC, as adopted by New Mexico, provides that a will may be revoked in one of the following ways:

(1) by executing a subsequent will that revokes the previous will or part expressly or by inconsistency; or

(2) by performing a revocatory act on the will if the testator performed the act with the intent and for the purpose of revoking the will or part or if another individual performed the act in the testator's conscious presence and by the testator's direction.

Section 45–2–507(A). In the present case, we are asked to construe the meaning of both subsections. First, we must decide if Decedent's "Revocation of Missing Will(s)"

document constitutes a "subsequent will that revokes the previous will," as previously construed by our Court in *In re Estate of Martinez*, 1999–NMCA–093, 127 N.M. 650, 985 P.2d 1230. Second, we must determine whether performing a revocatory act on a photocopy of a will, as opposed to the original will, is sufficient to revoke the will. Addressing each question in turn, we affirm the district court.

**"Revocation of Missing Will(s)" Document**

■ {12} As previously stated, Section 45–2–507(A)(1) provides that the only writing that may be used to revoke an existing will is a subsequent will. In *Martinez*, 1999–NMCA–093, our Court visited the meaning of Section 45–2–507(A)(1), which allows for the revocation of a will by a subsequent will. *Martinez*, 1999–NMCA–093, ¶ 8. In that case, the decedent executed a will appointing one of his children as his personal representative and leaving some of his real property to two other children. *Id.* ¶ 2. Nearly ten years later, the decedent executed a document in which the decedent declared that he wished to revoke his prior will. *Id.* ¶ 3. After the decedent passed away, the district court concluded that the decedent died intestate as he had validly revoked his prior will. *Id.* ¶ 5. Our Court reversed. *Id.* ¶ 1.

{13} In our opinion, we observed that "statutes providing for revocation of wills are mandatory and that generally a will may be revoked only in the manner prescribed by statute." *Id.* ¶ 9 (citing *Albuquerque Nat'l Bank v. Johnson*, 74 N.M. 69, 71, 390 P.2d 657, 658 (1964)). Additionally, we observed that "the intent of the testator, no matter how unequivocal, is insufficient to effect revocation if it does not comply with the statutory method of revocation." *Id.* (citing *Pershbacher v. Moseley*, 75 N.M. 252, 256, 403 P.2d 693, 695 (1965)). We further noted that although both of these principles were first announced in cases that predated New Mexico's adoption of the UPC, these principles remained true under the UPC. *Id.* ¶ 10.

{14} Our Court next considered the requirements of Section 45–2–507(A)(1), which allows for the revocation of a will by a subsequent will. *Martinez*, 1999–NMCA–093,

¶ 11. We noted that our statutes define a will as " 'any testamentary instrument' " that, among other things, " 'revokes or revises another will.' " *Id.* (quoting § 45–1–201(A)(53)). We further recognized that " '[a] testamentary instrument is one that operates only upon and by reason of the death of the maker.' " *Id.* (quoting *Vigil v. Sandoval*, 106 N.M. 233, 235, 741 P.2d 836, 838 (Ct.App.1987)). Finally, we observed that a document or instrument that is testamentary must also be properly executed and witnessed, as required by Section 45–2–502, to satisfy the will requirement of Section 45–2–507(A)(1). *Martinez*, 1999–NMSC–093, ¶¶ 11–12.

{15} Applying those rules to the document at issue in *Martinez*, our Court concluded that the decedent did not revoke his will because the document in which he declared his intent to revoke the will lacked testamentary language and thus could not be considered a subsequent will. *Id.* ¶ 11. We observed that, unlike a will, the document "would have taken effect immediately, not after the death of the decedent." *Id.* Additionally, we concluded that the document could not be a subsequent will because it was not signed by two witnesses, which is required by Section 45–2–502. *Martinez*, 1999–NMCA–093, ¶ 12. As such, we held that the decedent's will was not revoked. *Id.* ¶ 13.

■ {16} In the present case, Wife argues that *Martinez* is distinguishable. She maintains that the "Revocation of Missing Will(s)" document, which was properly executed and witnessed, does contain testamentary language and therefore does comport with Section 45–2–507(A). Wife points to language within the document stating that Betty and Ted Dale were not to inherit anything from Decedent's estate as evidence of the testamentary nature of the document. We observe, however, that Decedent expressly states in the document that it was his intent "to revoke any and all wills and codicils made by me at any time heretofore *without making a subsequent will.*" (Emphasis added.) Such language indicates that although some portions of the document may arguably contain testamentary language, the document

itself was not intended to be a subsequent will. Thus, we do not believe that the document satisfies Section 45–2–507(A)(1), which allows for the revocation of a will only by a subsequent will. *See Martinez,* 1999–NMCA–093, ¶¶ 11–12. We therefore hold that Decedent's "Revocation of Missing Will(s)" document did not revoke his last will and testament.

### Revocatory Act on Photocopy of Will

■ {17} We next address Wife's assertion that Decedent's act of writing "revoked" across the pages of a photocopy of his will was sufficient to revoke the original. As previously mentioned, in addition to revoking a will by subsequent will, a will may also be revoked "by performing a revocatory act on the will." Section 45–2–507(A)(2). The UPC defines a "revocatory act" as "burning, tearing, canceling, obliterating or destroying the will or any part of it." *Id.* According to the UPC, it is not necessary that the revocatory act actually touch any of the words on the will itself. *Id.*

{18} In the present case, there is no question that had Decedent written the word "revoked" on the pages of an original will, Decedent's last will and testament would have been considered revoked and would not have been admitted to probate, providing of course that Decedent performed the revocatory act with the intent and purpose of revoking his will. *See, e.g., Boddy v. Boddy,* 77 N.M. 149, 151, 154, 420 P.2d 301, 302, 304 (1966) (holding, in a pre-UPC case, that the decedent properly revoked his will by writing the word "void" across the pages of will). Less clear, however, is whether a revocatory act on a photocopy achieves the same result.

{19} In support of her argument that Decedent's revocatory act on a photocopy was sufficient to revoke the original, Wife cites to a number of cases in which courts have held that a revocatory act performed on a duplicate original or executed carbon copy of a will is sufficient to revoke the original will. *See, e.g., In re Estate of Tong,* 619 P.2d 91, 92 (Colo.Ct.App.1980) (cancelling executed carbon copy of will sufficient to revoke original will); *In re Holmberg's Estate,* 400 Ill. 366, 81 N.E.2d 188, 191 (1948) (writing "void"

on executed carbon copy sufficient to revoke original will); *In re Will of Nassano,* 199 N.J.Super. 414, 489 A.2d 1189, 1191 (Ct.App. Div.1985) (writing "null and void" on executed duplicate copy sufficient to revoke original will). We observe, however, that duplicate originals and executed carbon copies are not the same as photocopies. *See Lauermann v. Super. Ct.,* 127 Cal.App.4th 1327, 26 Cal. Rptr.3d 258, 262 (2005) (holding that the term "duplicate original" does not include a photocopy).

■ {20} Duplicate originals result from when a will is executed in duplicate, that is, more than one copy of the original will is signed, witnessed, and notarized at the same time the original is executed. *Id.* at 260, 262 (holding that a "duplicate original" is a "will executed in duplicate," meaning "that the testator has physically signed two separate *copies* of his will, each of which has also been witnessed and signed by the witnesses" (internal quotation marks and citation omitted)). Similarly, although a carbon copy is akin to photocopy, an executed carbon copy is actually physically signed by the testator. *See Black's Law Dictionary* 609 (8th ed. 2004) (defining "executed" as a document "that has been signed"); *see also In re Estate of Stanton,* 472 N.W.2d 741, 747 (N.D.1991) (differentiating between an executed copy of a will and an unexecuted copy of a will). Conversely, photocopies, unlike duplicate originals or executed carbon copies, do not bear the actual signature of the testator. *See In re Estate of Goodwin,* 2000 OK CIV APP 147, ¶ 16, 18 P.3d 373.

{21} Courts have also recognized that treating photocopies differently from duplicate originals or executed carbon copies is important as a matter of policy. For example, the Oklahoma Court of Appeals has observed that

> Administrator points out the ease with which an individual, using common office computers, scanners, and software, could create an unauthorized will, scan and reproduce an authentic signature from another document, and merge the authentic signature and the bogus document. After making a photocopy of the bogus document, the final result would be indistin-

guishable from a photocopy of an authentic document. While the authenticity of the document in this case is not in question, the statutory requirement of an original signature on reproduced documents would serve as a safeguard against such an acts. *Goodwin*, 2000 OK CIV APP 147, ¶ 11 n. 3; *cf. Lauermann*, 26 Cal.Rptr.3d at 262 ("[N]ot only are photocopies ubiquitous, but the simplicity of their creation stands in stark contrast to the considerable formalities surrounding the execution of a will."). Similarly, a New York court wondered what would happen upon a testator's death in which the original will was found, but not all of the photocopies could be located. *See In re Estate of Charitou*, 156 Misc.2d 952, 595 N.Y.S.2d 308, 311 (N.Y.Surr.Ct.1993). The court noted that under such circumstances, "it might be contended that one or more of the photocopies had been destroyed by decedent with the intention to revoke the will." *Id.* The court in *Lauermann* envisioned a similar problem:

> A testator may make several photocopies of his or her will, perhaps to send to relatives or other beneficiaries, or to retain for the purpose of drafting possible changes. It would be unreasonable to expect a testator to track down and destroy all such copies before giving effect to his intended revocation. Thus, the rule urged by real parties in order to carry out a supposed testamentary intent might just as well have the pernicious effect of preserving the validity of a will which the testator had done everything in his power to revoke.

26 Cal.Rptr.3d at 261–62. Based on the differences between photocopies and duplicate originals or executed carbon copies, a number of courts have held that a revocatory act performed on a photocopy of a will does not revoke the original will. *See, e.g., In re Estate of Tolin*, 622 So.2d 988, 990 (Fla. 1993); *Charitou*, 595 N.Y.S.2d at 311–12; *Stanton*, 472 N.W.2d at 747; *see also* Restatement (Third) of Property § 4.1 cmt. f (1999) ("Performing the [revocatory] act on another document or on an unexecuted copy of the will is insufficient."). We therefore do not consider Wife's reliance on cases involving duplicate originals or executed carbon copies to be helpful to our analysis.

{22} Wife fails to cite to any cases in which a revocatory act performed on a photocopy of a will is sufficient to revoke the original will. We observe, however, that Wife does cite *In re Kehr's Estate*, 373 Pa. 473, 95 A.2d 647 (1953), which presents a slightly different factual scenario than in the cases distinguished above. In *Kehr*, a testator's act of writing "null and void" on an *unexecuted* carbon copy was found to revoke the testator's original will. *Id.* at 650. An unexecuted carbon copy, which lacks an actual signature, is seemingly analogous to a photocopy. We observe, however, that the holding in that case is not that performing a revocatory act on an unexecuted carbon copy is sufficient to revoke the original, but that the carbon copy with the words "null and void" written on it constituted "some other writing," which the court in *Kehr* concluded can be used to revoke a prior will. *Id.* at 649–50 (citing to the Wills Act of 1947, which allowed for the revocation of a will either by a subsequent will or by some other writing declaring the will to be revoked). New Mexico does not permit revocation of a will by some other writing. *See* § 45-2-507(A). *Kehr* is therefore also distinguishable from the case at bar.

{23} Wife argues that a holding that performing a revocatory act on a photocopy of a will does not revoke the original would be contrary to one of the purposes of the UPC, which is "to discover and make effective the intent of a decedent in distribution of his property." *See* § 45-1-102(B)(2). Wife maintains that because there are factual issues concerning Decedent's intent with respect to revocation of his will, the district court erred in granting summary judgment in favor of Niece. In support of her assertion, Wife contends that it is disputed whether Decedent called Dale and requested that Dale send him the original copy of the will. Even assuming that Decedent attempted to obtain a copy of his original will and that such an action demonstrates Decedent's intent, we conclude that summary judgment was properly granted in favor of Niece.

{24} Wife correctly observes that one of the stated purposes of the UPC is to give effect to the intent of the testator. *See id.* We do not believe, however, that the intent of the testator can override the actual provisions of the UPC. We believe that our Court in *Martinez* made this point clear when it recognized that "the intent of the testator, no matter how unequivocal, is insufficient to effect revocation if it does not comply with the statutory method of revocation." 1999–NMCA–093, ¶ 9. Although our Court relied on a pre-UPC case for that proposition, we believe that the proposition has survived the adoption of the UPC.

{25} In determining the importance of a testator's intent, we find it significant that in adopting our version of the UPC, our legislature chose not to adopt section 2–503 of the UPC. *See* § 45–2–503. According to that provision:

Although a document or writing added upon a document was not executed in compliance with Section 2–502, the document or writing is treated as if it had been executed in compliance with that section if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute (i) the decedent's will, (ii) a partial or complete revocation of the will, (iii) an addition to or an alteration of the will, or (iv) a partial or complete revival of his [or her] formerly revoked will or of a formerly revoked portion of the will.

Unif. Probate Code § 2–503 (amended 1997), 8 U.L.A. 38 (Supp.2006). "The UPC section 2–503 harmless-error rule has since been enacted into the state statutes of Colorado, Hawaii, Michigan, Montana, South Dakota and Utah." Emily Sherwin, *Clear and Convincing Evidence of Testamentary Intent: The Search for a Compromise Between Formality and Adjudicative Justice*, 34 Conn. L.Rev. 453, 454 n. 2 (2002). Under section 2–503, had it been adopted in New Mexico, if Decedent's intent was established by clear and convincing evidence, the district court could have concluded that although Decedent's attempt to revoke his will did not comport with the UPC's requirements for the revocation of a will, his will was nonetheless revoked. In the absence of such a provision, we do not believe that Decedent's intent can control the result.

{26} The understanding that the statutory provisions of the UPC still control irrespective of a testator's intent has been recognized by a number of UPC jurisdictions. For example, in determining the effect that a testator's intent has on the content of a will, the Arizona Court of Appeals concluded that regardless of a testator's intent, "a duly executed will remains effective unless the testator takes the steps required by statute to revoke it in whole or part." *In re Estate of Ward,* 200 Ariz. 113, 23 P.3d 108, 112 (Ct.App.2001). Arizona adopted the UPC in 1973. *In re Estate of Mason,* 190 Ariz. 312, 947 P.2d 886, 887 (Ct.App.1997).

{27} Like Arizona, North Dakota adopted the UPC in 1973. *In re Estate of Kimbrell,* 2005 ND 107, ¶ 6, 697 N.W.2d 315. In *Stanton,* the Supreme Court of North Dakota rejected the argument that performing a revocatory act-in this case, crumpling-on a certified copy of a will was sufficient to revoke the original will. 472 N.W.2d at 747. The court observed that "the physical act of destruction ('crumpl[ing]') was not made of the original will, but rather of a copy of the will." *Id.* The court then concluded that "[w]hile the destruction of an executed, duplicate will may operate to revoke the original will, the destruction of an unexecuted or conformed copy is ineffectual as an act of revocation regardless of the testator's intent." *Id.* (citations omitted). The testator's attempted revocation was therefore ineffective. *Id.*

{28} We believe that "it would be misguided sympathy to hold that a clear intent to revoke a will can be a substitute for compliance with the other statutory requirements." *Charitou,* 595 N.Y.S.2d at 311. As previously recognized, while one of the UPC's stated purposes is "to discover and make effective the intent of a decedent," § 45–1–102(B)(2), it nonetheless remains true that in order to revoke a will, a testator must comply with the UPC's requirements for revocation of wills. *Martinez,* 1999–NMCA–093, ¶ 9; *see Ward,* 23 P.3d at 112; *Stanton,* 472 N.W.2d at 747. "To reach a contrary conclusion

would be to undermine the rigorous, but necessary, statutory provisions relating to revocation of wills." *In re Coffed's Estate,* 46 N.Y.2d 514, 414 N.Y.S.2d 893, 387 N.E.2d 1209, 1210 (1979); *see In re Wehr's Will,* 247 Wis. 98, 18 N.W.2d 709, 715 (1945) (concluding that "to hold that a mutilation of a conformed copy was a revocation would be to interpolate or add to the statute what plainly is not there or to establish a symbolic revocation by judicial decree in the face of a statute which plainly does not mean to recognize it"). Moreover, although such a rule may lead to unfair results, "[a] less stringent provision would open the door to the dual evils of fraud and perjury, and perhaps fail to impress upon the mind of the testator the solemnity of the occasion." *Coffed,* 387 N.E.2d at 1211 (citation omitted).

{29} We therefore hold that the statutory language "on the will" in Section 45-2-507(A)(2) means on the original will or on a fully executed copy. In light of this holding, Decedent's attempt to revoke his will by writing "revoked" on a photocopy was not effective to revoke the original will. In so holding, we observe that Decedent's inability to obtain his original will did not foreclose his ability to revoke his will if he desired to. Although Decedent was unable to revoke his will by performing a revocatory act upon it, the UPC provides that a will may also be revoked by a subsequent will. *See* § 45-2-507(A)(1); *see also* Robert Whitman, *Revocation and Revival: An Analysis of the 1990 Revision of the Uniform Probate Code and Suggestions for the Future,* 55 Alb. L.Rev. 1035, 1035 (1992) ("In the hands of a competent lawyer, concern for creating ambiguity when a will is revoked is minimized. This is so because, unless there are extraordinary circumstances, an attorney can effectively provide for revocation of an old will by drafting a new will, which revokes all previous wills."). Thus, if Decedent truly wished to revoke his will and allow his estate to pass by intestacy, he could have simply drafted and executed a new will, which would have served to revoke his original will, and then he could have easily destroyed the new will immediately after its execution. At that point, Decedent would have revoked all of his previous wills and his estate would pass by intestacy.

Decedent did not do this. We therefore conclude that the district court properly granted summary judgment in favor of Niece on the grounds that Decedent did not revoke his last will and testament.

## CONCLUSION

{30} We affirm the district court's grant of summary judgment.

{31} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge and RODERICK T. KENNEDY, Judge.